1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RAMON SAUL SILVA, JR.

                Plaintiff,

    v.

ROGELIO ZARAGOZA,

                Defendant.

Case No. C21-5235-RJB-SKV

REPORT AND RECOMMENDATION

## I.    INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983.  Plaintiff Ramon Silva is

a State prisoner who is currently confined at the Washington State Penitentiary ("WSP") in

Walla Walla, Washington.  He alleges in this action that his substantive due process rights were

violated when he was subjected to conditions of confinement that amounted to punishment while

confined at Western State Hospital ("WSH") in February 2020 for purposes of competency

restoration.  *See* Dkt. 5 at 4-6.  Dr. Rogelio Zaragoza, the lone Defendant named in this action, is

the attending psychiatrist at the Gage Center for Forensic Services ("GCFS") at WSH.  *See id*. at

REPORT AND RECOMMENDATION
PAGE - 1

3; Zaragoza Decl. (Dkt. 23), ¶ 2.  Plaintiff seeks compensatory and punitive damages totaling

$26 million, and declaratory relief.  Dkt. 5 at 10.

        This matter is now before the Court on the parties' cross-motions for summary judgment.

Plaintiff filed his motion for summary judgment in July 2021 while discovery was ongoing.  Dkt.

14.  Defendant thereafter filed a response to Plaintiff's motion together with a cross-motion for

summary judgment.  Dkt. 22.  Defendant submitted in support of his response and cross-motion

his own declaration (Zaragoza Decl., Dkt. 23) and the declaration of Dr. George Petzinger, Chief

Medical Officer at the GCFS at WSH (Petzinger Decl., Dkt. 24).  Plaintiff filed a reply brief in

support of his motion for summary judgment (Dkt. 26), followed by a response to Defendant's

motion for summary judgment[1] (Dkt. 31).  Plaintiff subsequently filed a supplemental response

to Defendant's cross-motion for summary judgment (Dkt. 42), which largely duplicates

arguments set forth in his earlier reply brief (Dkt. 26).  Defendant filed a reply to the

supplemental response (Dkt. 44), which completed the briefing on the pending summary

judgment motions.

        The Court, having reviewed the parties' motions, all related briefing, and the balance of

the record, concludes that Plaintiff's motion for summary judgment should be denied and

Defendant's cross-motion for summary judgment should be granted.  The Court further

concludes that Plaintiff's complaint and this action should be dismissed with prejudice.

---

[1] Plaintiff's response addresses only the purported expert testimony of Dr. Zaragoza and Dr. Petzinger, as set forth in the referenced declarations, and he asks that this testimony be stricken.  Dkt. 31.  Defendant filed a reply to Plaintiff's response, primarily addressing Plaintiff's request to strike the declarations.  Dkt. 39.  This Court addressed Plaintiff's objections to the doctors' declarations in a prior order (Dkt. 40), and the Court will not revisit the issue here except to confirm that the declarations will not be stricken.

REPORT AND RECOMMENDATION
PAGE - 2

## II.     BACKGROUND

### A.     Plaintiff's Allegations

Plaintiff alleges in his complaint that, on February 10, 2020, he was transported from the King County Correctional Facility ("KCCF") to WSH for court-ordered competency restoration. Dkt. 5 at 4. Plaintiff maintains that, upon his arrival at WSH, he asked that he be allowed his personal property, though he does not identify in his pleading what, if any, personal property he had that he wanted access to. *Id*. at 4-5. According to Plaintiff, he witnessed other patients at WSH, including those committed pursuant to a finding of not guilty by reason of insanity ("NGRI") and those who were civilly committed, wearing personal clothing, listening to personal MP3 players, and playing Nintendo games. *Id*. at 5. Plaintiff claims he was told that because he was at WSH on "competency status" he could not have any personal property other than his legal documents. *Id*.

Plaintiff asserts that, on February 27, 2020, he was invited to attend a meeting with his treatment team during which he asked Dr. Zaragoza, the head of the treatment team, that he be allowed access to his personal property, but his request was denied. *Id*. Once again, Plaintiff fails to identify what, if any, personal he had that could have been provided to him. Plaintiff states that when he asked how the denial of personal property was reasonably related to his treatment, Dr. Zaragoza advised him that it was not treatment related but was, instead, a rule that applied to all competency patients. *Id*. Plaintiff claims that this restriction on his personal property amounted to punishment, was not reasonably related to treatment purposes, and was far more restrictive than the conditions experienced by other WSH patients. *Id*. at 5-6. Plaintiff alleges that this restriction constituted a substantive due process violation. *Id*. at 5.

REPORT AND RECOMMENDATION
PAGE - 3

1

### B.     Facts Re: Plaintiff's Admission to WSH

2

On February 7, 2020, Plaintiff was admitted to WSH on a 90-day competency restoration

3

order from the King County Superior Court where he was facing charges of second-degree

4

assault and custodial assault.  Zaragoza Decl., ¶ 4.  This was Plaintiff's third admission to WSH.

5

*Id*.  During the admission process, Plaintiff complained that he was a "political prisoner," and

6

that he was "stuck in a political world game" that he planned on winning.  *Id*., ¶ 5.  Plaintiff

7

expressed his belief that he was a "team commander" in a "simulation."  *Id*.

8

On February 20, 2020, Plaintiff met with members of his treatment team, which included

9

Dr. Zaragoza, to complete a treatment plan.  *Id*., ¶ 6.  Dr. Zaragoza explains that the purpose of

10

the treatment plan process is to familiarize the treatment team and the patient with each other, to

11

complete assessments, and to identify treatment goals and objectives.  *Id*., ¶ 7.  The process also

12

involves identifying potential risk factors and challenges.  *Id*., ¶ 8.  Plaintiff was identified as a

13

danger to others, "having recurrent or ongoing violent or aggressive ideations without a specific

14

plan, and demonstrating impulsive/unpredictable behaviors."  *Id*.  At the conclusion of the

15

treatment plan process, Plaintiff was given an opportunity to indicate whether or not he agreed

16

with the plan, but he refused to sign-off on the document and therefore never indicated if he

17

agreed with the plan or not.  *Id*., ¶ 9.

18

On February 25, 2020, Plaintiff submitted a kite requesting access to an AM/FM radio or

19

an MP3 music player.  *Id*., ¶ 10.  The kite specifically stated as follows:

20

> Other teams in the virtual reality are stealing my points by using telepathy and
> trying to convert me to their team.  I need AMFM/MP3 walkman to block out the

21

> voices.  This was a tactic I used in the community so they couldn't get through
> and attack my avatars stat levels and drain my player points.  This technique

22

> worked before so please put it in my individualized treatment plan to allow MP3
> and headphones for treatment purposes.

23

REPORT AND RECOMMENDATION
PAGE - 4

1   *Id.* Plaintiff's request was denied because the treatment team determined it did not meet the

2   criteria for a medical or therapeutic exception to the ward rules. *Id.*, ¶ 11. Three days later, on

3   February 28, 2020, Plaintiff was transported back to KCCF. *Id.*, ¶ 12.

4         **3.**      **Facts Re: Conditions of Confinement at WSH**

5         WSH is an inpatient psychiatric hospital that houses and treats individuals who fall into a

6   variety of different categories. Petzinger Decl., ¶ 8. In addition to competency restoration

7   patients, such as Plaintiff, WSH also houses and treats NGRI patients and patients who are

8   civilly committed through the state's legal process to undergo forced in-patient mental health

9   treatment. *See* Dkt. 22 at 2-3; Petzinger Decl., ¶¶ 8, 9. The different categories of patients at

10  WSH are subject to specific guidelines, and these guidelines are set forth in patient handbooks

11  dedicated to each category of patient, *i.e.,* NGRI patients, civilly committed patients, and

12  competency restoration patients. *See* Petzinger Decl., ¶¶ 3-5, Attach. A-C. Each category of

13  patient has appropriate unit rules designed to ensure a safe and secure therapeutic environment

14  while maintaining patients' rights and achieving treatment goals. *Id.*, ¶¶ 8, 9.

15        Competency restoration patients are subject to restrictions that are generally not

16  applicable to NGRI and civilly committed patients. In particular, street clothes and shoes are not

17  allowed on the competency restoration ward. *Id.*, Attach. A, p. 17. Likewise, personal property

18  is not allowed on the ward except for legal paperwork brought from the jail and the patient's

19  folder from the Treatment Recovery Center containing education materials from classes. *Id.*,

20  Attach. A, p. 19. Competency restoration patients are also prohibited from carrying cash on their

21  person, though they may still purchase commissary items if they have accumulated incentive

22  points. *Id.*, Attach. A, pp. 17, 29.

23

REPORT AND RECOMMENDATION
PAGE - 5

In contrast, civilly committed patients have the right to wear their own clothes and use their own possessions, and to keep and spend their own money. *Id*., Attach. B, p. 16. However, these rights are subject to restriction if exercise of the rights constitutes a safety or security issue, creates a danger to the patient or others, or interferes with the patient's treatment. *Id*. NGRI patients, similar to civilly committed patients, are allowed to wear personal clothes and shoes, and to possess personal items not on the contraband list. *Id*., Attach. C, p. 13. NGRI patients may also have store-bought grooming and hygiene items and electronic items, though such items are subject to check-in/check-out procedures. NGRI patients are also permitted to withdraw cash from their patient account but may not have more than $25 at any given time. *Id*., Attach. C, p. 14.

Dr. Petzinger emphasizes that it is "vital" to the success and overall safety of a ward for all patients in a given ward to be subject to the same polices and guidelines, as consistency of rules within a ward decreases the risk of jealousy and manipulation between patients. *Id*., ¶ 10.

## III.    DISCUSSION

Plaintiff argues in his motion for summary judgment that he is entitled to judgment as a matter of law because he was subjected to conditions of confinement at WSH "substantially worse than patients whom [sic] were committed not guilty be reason of insanity and civilly committed," and the conditions must therefore be presumed punitive. Dkt. 14 at 1. Plaintiff further argues that the conditions of his confinement at WSH were worse than those for convicted criminals housed at KCCF, and worse than those he is currently subjected to at WSP where he is housed in the Residential Treatment Unit ("RTU"). *Id*. at 2-3. Defendant argues in his response and cross-motion for summary judgment that he is entitled to judgment as a matter

REPORT AND RECOMMENDATION
PAGE - 6

1  of law with respect to Plaintiff's substantive due process claim because the WSH treatment

2  program is a product of professional judgment and it provided Plaintiff with an opportunity to

3  improve his mental condition, which conforms to constitutional standards.  Dkt. 22 at 11.  The

4  Court addresses the two motions separately below, beginning with Defendant's motion.

5      **A.      Applicable Legal Standards**

6          *1.      Summary Judgment Standard*

7          Summary judgment is appropriate when a "movant shows that there is no genuine dispute

8  as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

9  56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party

10 fails to make a sufficient showing on an essential element of his case with respect to which he

11 has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving

12 party bears the initial burden of showing the district court "that there is an absence of evidence to

13 support the nonmoving party's case."  *Id*. at 325.  The moving party can carry its initial burden

14 by producing affirmative evidence that negates an essential element of the nonmovant's case, or

15 by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of

16 persuasion at trial.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102

17 (9th Cir. 2000).  The burden then shifts to the nonmoving party to establish a genuine issue of

18 material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The

19 Court must draw all reasonable inferences in favor of the nonmoving party.  *Id*. at 585-87.

20         In supporting a factual position, a party must "cit[e] to particular parts of materials in the

21 record . . .; or show[] that the materials cited do not establish the absence or presence of a

22 genuine dispute, or that an adverse party cannot produce admissible evidence to support the

23

REPORT AND RECOMMENDATION
PAGE - 7

1    fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that

2    there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S.

3    at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes

4    over facts that might affect the outcome of the suit under the governing law will properly

5    preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-

6    48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient

7    disagreement to require submission to a jury or whether it is so one-sided that one party must

8    prevail as a matter of law." *Id*. at 251-52.

9        The opposing party must present significant and probative evidence to support its claim

10   or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

11   "The mere existence of a scintilla of evidence in support of the non-moving party's position is

12   not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d

13   1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with

14   allegations in the complaint, or with unsupported conjecture or conclusory statements."

15   *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003).

16       When parties file cross-motions for summary judgment, as the parties have done here, each

17   motion "must be considered on its own merits." *Fair Housing Council of Riverside County, Inc. v.*

18   *Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The court must review the evidence

19   submitted in support of each cross-motion. *Id*. And, although the parties may each assert there are

20   no uncontested issues of material fact, the Court must determine whether disputed issues of

21   material fact are present. *Id*.; *Osborn v. Butler*, 712 F. Supp. 2d 1134, 1148 (D. Idaho 2010).

22

23

REPORT AND RECOMMENDATION
PAGE - 8

2.    *Section 1983 Standard*

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law.  *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

3.    *Substantive Due Process*

Mentally incapacitated criminal defendants have a substantive due process right to minimally adequate care and restorative treatment.  *See Youngberg v. Romeo*, 457 U.S. 307, 318-20 (1982); *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1120-21 (9th Cir. 2003).  To determine whether the substantive due process rights of an incapacitated criminal defendant have been violated, the Court must balance the individual's "liberty interests against the relevant state interests."  *Mink*, 322 F.3d 1121 (citing *Youngberg*, 457 U.S. at 321).

To achieve the proper balance in the context of a patient confined in a state institution, "the Constitution only requires that the courts make certain that professional judgment in fact was exercised" in caring for the individual.  *Id*. at 321.  Decisions regarding the individual's care,

REPORT AND RECOMMENDATION
PAGE - 9

"if made by a professional, [are] presumptively valid," and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id*. at 323. The Ninth Circuit has explained, in the related context of individuals who have been civilly committed, that the Fourteenth Amendment requires such individuals "not be subjected to conditions that amount to punishment . . . within the bounds of professional discretion." *Hydrick v. Hunter*, 466 F.3d 676, 699 (9th Cir. 2006) (citing *Bell v. Wolfish*, 441 U.S. 420, 536 (1979); *Youngberg*, 457 U.S. at 321-22), *overruled on other grounds*.

    **B.**    **Analysis**

        *1.*    *Defendant's Motion for Summary Judgment*

    Defendant argues in his motion for summary judgment that he is entitled to judgment as a matter of law with respect to Plaintiff's substantive due process claim because the policies and guidelines implemented by WSH are consistent with the professional judgment standard applied in *Youngberg*. Dkt. 22 at 1. More specifically, Defendant argues that the WSH treatment program satisfies constitutional standards because it is the product of professional judgment and it provided Plaintiff with a realistic opportunity to improve his mental condition. *Id*. at 11.

    Defendant offers in support of this argument the description of the treatment afforded Plaintiff at WSH in February 2020 as set forth in Dr. Zaragoza's declaration, the description of the WSH treatment program provided by Dr. Petzinger in his declaration, and the policy and guideline handbooks applicable to various categories of WSH patients which are attached to Dr. Petzinger's declaration. *Id*. at 12; Zaragoza Decl., Petzinger Decl. Defendant maintains that this

REPORT AND RECOMMENDATION
PAGE - 10

1    evidence "demonstrate[s] that extensive judgment and planning have gone into creating an

2    effective and evidence-based competency restoration treatment program." *Id*. at 12.

3          A review of the handbooks reveals that though there is some degree of overlap in the

4    handbooks provided to the three categories of WSH patients, *i.e.*, competency restoration

5    patients, civilly committed patients, and NGRI patients, each handbook is specifically tailored to

6    the treatment plans and objectives, and other needs, of the patients in the relevant categories. *See*

7    Petzinger Decl., Attach. A-C. The Admissions and Competency Restoration Handbook provides

8    a detailed overview of the competency restoration program, including ward rules and

9    expectations, treatment expectations and objectives, patient rights and responsibilities, and the

10    program's "level system," a system through which privileges may be earned (or lost) based on a

11    patient's adherence to established guidelines. *Id*., Attach. A.

12          The handbooks for civilly committed patients and NGRI patients likewise identify patient

13    rights and responsibilities and provide details regarding treatment programs. *See id*., Attach. B,

14    C.[2] These handbooks reflect the differences between categories of patients served by WSH and,

15    in particular, the different treatment goals and objectives of the different categories of patients.

16    These differences are reflected in ward rules, including property allowances and privileges.

17          Plaintiff does not appear to take issue with the general treatment program for competency

18    restoration patients, his concern appears instead to be limited to the restrictions on access to

19    personal property imposed on competency restoration patients which he does not believe were

20

21          [2] Defendant provided only a portion of the NGRI handbook for the Court's review, but the index to the
handbook, which was included, identifies topics suggesting the handbook contains a code of conduct, room search

22    provisions, detailed explanations of treatment plans and objectives, and an overview of the "level system" specific to
NGRI patients. *See* Petzinger Decl., Attach. C, pp. 3-4.

23

REPORT AND RECOMMENDATION
PAGE - 11

reasonably related to treatment purposes.[3]  Dr. Petzinger explains, however, that competency restoration patients are distinguishable from other categories of WSH patients in that they have actively pending criminal law violations, nearly all of which are felony charges and many of which are assaultive in nature.  *Id.*, ¶ 8.  According to Dr. Petzinger, many personal items, such as headphone cords and shoelaces, can easily be used as weapons and are therefore not allowed in the competency restoration unit.  *Id.*

Competency restoration patients also differ from other categories of patients in relation to their discharge planning process and goals.  *Id.*, ¶ 9.  With respect to civilly committed patients, the goal of treatment teams is to provide support and tools to assist these individuals in transitioning to a life outside WSH, which frequently means allowing these patients increased freedom inside the facility to increase the likelihood of success once they leave the structure of WSH.  *Id.*  NGRI patients likewise work towards the goal of transitioning back into the community.  *See id.*, Attach. C, p. 7.  Competency restoration patients, in contrast, do not have the same discharge planning as they are not civilly committed and will not be discharged from WSH.  *Id.*  If these patients achieve competency they will be returned to jail where their criminal charges are pending.  *Id.*

In sum, the evidence makes clear that different categories of patients have different treatment needs and objectives, and different guidelines and policies are necessary to address

---

[3]  The Court notes again that it is unclear whether Plaintiff even had any personal property he could have accessed absent the WSH restrictions as he doesn't specifically identify any such property and the Competency Restoration Handbook specifically provides that no personal property will be accepted by staff upon admission to the facility.  Petzinger Decl., Attach. A, p. 7.

REPORT AND RECOMMENDATION
PAGE - 12

these needs. Moreover, as Dr. Petzinger emphasizes, it is crucial to the success and overall safety of each ward for all patients in the ward to be subject to the same polices and guidelines.

Dr. Petzinger and Dr. Zaragoza both maintain that the guidelines implemented at WSH for the various categories of patients are the product of the professional judgment of WSH and its treatment teams, and that the treatment programs offer all patients a reasonable opportunity to improve the mental conditions for which they are confined. *See* Zaragoza Decl., ¶ 13; Petzinger Decl., ¶ 12.

Plaintiff offers no actual evidence that the WSH treatment guidelines and policies are *not* the product of professional judgment, though he identifies a number of ways in which he believes the conditions he was subjected to at WSH departed from accepted professional judgment. *See* Dkt. 26, Dkt. 42. First, Plaintiff points to a list of rights that were read to him when he was admitted to WSH and which he was asked to sign. Dkt. 26 at 1, Ex. A. Among the rights listed on the form is the right of patients to "wear your own clothes and to keep and use personal possessions," and to "keep and be allowed to spend a reasonable sum of your own money for canteen expenses and small purchases." *See id.*, Ex. A at 1. Plaintiff argues that this list of rights was devised by one or more professionals and was the product of professional judgment exercised before Defendant and Dr. Petzinger assumed their current positions. *Id.* at 2. Plaintiff maintains that denying him access to the property listed in the patient's rights form constitutes a "departure from accepted professional judgment." *Id.*

Plaintiff fails to acknowledge, however, the general qualification preceding the rights he references to the effect that the rights apply "insofar as danger to yourself or others is not created." *Id.*, Ex. A. In addition, immediately following the declaration that a patient has the

REPORT AND RECOMMENDATION
PAGE - 13

1    right to wear personal clothing and keep personal possessions, is the qualification that the right

2    applies "except when deprivation of same is essential to protect your safety, or the safety of other

3    persons." *Id.* The specific rules applicable to competency restoration patients are not

4    inconsistent with this general list of patient's rights when viewed in light of this qualifying

5    language, and the rules therefore do not constitute a significant departure from accepted

6    professional judgment.

7         Plaintiff also takes issue with Dr. Petzinger's explanation of the importance of consistent

8    rules and expectations for each patient in a given ward. Dkt. 26 at 3. Plaintiff maintains that this

9    emphasis on consistency undermines the right of each patient to receive individualized treatment

10   which, in turn, substantially departs from accepted professional judgment. *Id.* The fact that rules

11   and property limitations are applied and enforced consistently in individual wards is not

12   inconsistent with a patient's right to receive appropriate, individualized care and treatment. The

13   handbooks for all categories of patients make reference to treatment plans, and the record makes

14   clear that Plaintiff met with his treatment team to create a treatment plan in which treatment

15   goals and objectives specific to him were identified. Zaragoza Decl., ¶¶ 6-9. That Plaintiff

16   refused to sign off on the plan does not undermine the conclusion that treatment plans specific to

17   individual patients are a part of the overall WSH program.

18        Plaintiff next complains that that he requested, and was denied, headphones through

19   which he could listen to music "to help him cope with 'voices.'" Dkt. 26 at 4. Plaintiff claims

20   that the denial of headphones for "treatment purposes" shows that his treatment was not

21   individualized. *Id.* He also claims that he was at WSH to "cure him of his delusions," which

22   included hearing voices, and that by denying his request for music via headphones, Defendant

23

REPORT AND RECOMMENDATION
PAGE - 14

caused him to become more paranoid because Plaintiff believed he was entitled to this particular property based on the patient rights read to him upon admission. *Id*. Plaintiff maintains that this lack of proper treatment resulted in a failure to restore his competency. *Id*.

While Plaintiff asserts generally in his complaint that he requested to be allowed personal property upon his arrival at WSH, the only indication in the record of Plaintiff having made a formal request for property was a kite he submitted on February 25, 2020 in which he requested an MP3 player and headphones for "treatment purposes." Dr. Petzinger makes clear in his declaration that despite the emphasis on consistency in application and enforcement of the guidelines in individual wards, exceptions to the guidelines, though rare, can be made if supported by medical or therapeutic need. Petzinger Decl., ¶ 11. According to Dr. Zaragoza, the treatment team denied Plaintiff request because it did not meet the criteria for a medical or therapeutic exception to the ward rules and expectations. Zaragoza Decl., ¶¶ 10, 11.

The determination by Plaintiff's treatment team that his request for an MP3 player and headphones did not meet the criteria for a medical or therapeutic exception to ward rules was an exercise of professional judgment. Plaintiff's suggestion that the denial of the MP3 player, which apparently occurred only three days before he was returned to KCCF, rendered the competency restoration process unsuccessful, is conclusory and not supported by any evidence in the record.

Finally, Plaintiff argues that the fact that inmates confined at the WSP RTU are allowed significant amounts of personal property demonstrates that the restrictions imposed on property at WSH were not the result of reasonable professional judgment. Dkt. 26 at 5. Plaintiff maintains that the RTU is very similar to WSH, though with higher security needs because it

REPORT AND RECOMMENDATION
PAGE - 15

houses dangerous and violent convicted felons, and yet it allows a "plethora" of personal property, including shoelaces and headphone cords, while still an effective therapeutic environment that is safe for patients. *Id*. Plaintiff reasons that the RTU is run by psychiatric professionals who exercised professional judgment in imposing fewer restrictions on property than those imposed at WSH, suggesting that the WSH restrictions were not the result of reasonable professional judgment. *Id*.

The fact that Plaintiff believes the RTU and WSH are equivalent because they both provide in-patient psychiatric treatment is not relevant to the question of whether WSH's more restrictive property policies constituted a substantial departure from accepted professional judgment. As was explained in *Youngberg*, the relevant inquiry in assessing a substantive due process claim is whether professional judgment was, in fact, exercised, not whether other professionally acceptable choices could or should have been made. *Youngberg*, 457 U.S. at 321. The record adequately demonstrates that restrictions on personal property at WSH were based on the exercise of professional judgment as to how to ensure the safety and security of patients and staff while also meeting treatment objectives. Plaintiff's final argument therefore fails.

The evidence in the record demonstrates that the polices and guidelines developed by WSH for application to the various categories of patients were the product of professional judgment, and that the application of those policies to Plaintiff during his brief tenure there in February 2020 were also the product of professional judgments. Defendants are therefore entitled to summary judgment with respect to Plaintiff's substantive due process claim.

REPORT AND RECOMMENDATION
PAGE - 16

2.    *Plaintiff's Motion for Summary Judgment*

Plaintiff, in his motion for summary judgment, argues that he is entitled to relief on his substantive due process claim under a different standard.  Specifically, Plaintiff argues that under the authority of *Jones v. Blanas*, 393 F.3d 932 (9th Cir. 2004), the conditions under which he was confined at WSH were presumptively punitive because they were worse than those of other categories of patients at WSH, worse than those of convicted criminals confined at KCCF, and worse than those Plaintiff is currently subjected to at the WSP RTU.  Dkt. 14.  Plaintiff details in his motion the additional property allowed to individuals confined in these other settings.  *See id*. Plaintiff, in particular, cites to the ability of other patients and/or prisoners to access personal clothes and shoes, personal MP3 music players, personal hygiene items, and personal funds to purchase candy, chips and soda.  *See id*. at 2-3.

In *Jones*, the case upon which Plaintiff relies, the plaintiff was a civil detainee who claimed that his substantive due process rights were violated when he was confined in a county jail for two years while awaiting proceedings under California's Sexually Violent Predator Act. *See Jones*, 393 F.3d at 931-32.  The Court there made clear that "[a]t a bare minimum . . . an individual detained under civil process—like an individual accused but not convicted of a crime—cannot be subjected to conditions that 'amount to punishment.'"  *Id*. at 932 (citing *Bell*, 441 U.S. at 536).  The Court went on to explain that when a civil detainee "is confined in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'"  *Id*. This presumption is, however, rebuttable.  *Id*. at 934.

REPORT AND RECOMMENDATION
PAGE - 17

1    Defendant argues that *Jones* is inapplicable in addressing Plaintiff's substantive due

2  process claim and that the *Youngberg* professional judgment standard is the appropriate standard

3  to apply.  Dkt. 22 at 18.  Defendant further argues that *Jones*, in any event, affords Plaintiff no

4  relief.  *Id*.  Defendant is correct.

5    As the *Jones* Court noted, under *Bell* and Ninth Circuit precedent, "a restriction is

6  'punitive' where it is intended to punish, or where it is 'excessive in relation to [its non-punitive]

7  purpose.'" *Id*. at 933-34 (citing *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004).  The

8  Supreme Court recognized in *Bell* that "maintaining institutional security and preserving internal

9  order and discipline are essential goals that may require limitation or retraction of the retained

10  constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546.

11  The Supreme Court has recognized in *Bell* that prison administrators "should be accorded wide-

12  ranging deference in the adoption and execution of policies and practices that in their judgment

13  are needed to preserve internal order and discipline and to maintain institutional security."  *Id*. at

14  547.

15    Defendant's evidence amply demonstrates that the property restrictions imposed on

16  competency restoration patients at WSH are reasonably related to the legitimate institutional

17  objective of maintaining institutional security and preserving internal order.  The Court once

18  again turns to Dr. Petzinger's statement that "[i]t is vital to the success and overall safety of a

19  ward for all patients in a given ward to be subject to the same policies and guidelines.  The

20  consistency of rules in a ward significantly decreases the risk of jealousy and manipulation

21  between patients."  Petzinger Decl., ¶ 10.  As the Chief Medical Officer at WSH, Dr. Petzinger's

22  endorsement of the challenged policy is entitled to deference.  Plaintiff offers no evidence that

23

REPORT AND RECOMMENDATION
PAGE - 18

the restriction on personal property at WSH was excessive in relation to the legitimate safety concerns of the facility. Thus, Plaintiff has not demonstrated that the conditions of his confinement at WSH were punitive and his motion for summary judgment should therefore be denied.

## IV.    CONCLUSION

Based on the foregoing, this Court recommends that Plaintiff's motion for summary judgment be denied, that Defendant's cross-motion for summary judgment be granted, and that Plaintiff's complaint and this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **December 17, 2021**.

DATED this 24th day of November, 2021.

S. KATE VAUGHAN
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 19